649 A.2d 901

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
VICTOR SANDSTROM, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted November 15, 1994—Decided November 30, 1994.

Before Judges PRESSLER, LANDAU and NEWMAN.

*Jabin and Fuoco, P.A.*, attorneys for appellant, (*Mr. Jabin* on
the brief).

No brief was submitted on behalf of respondent, State of New Jersey.

The opinion of the court was delivered by

NEWMAN, J.S.C. (temporarily assigned).

Tried in the municipal court, defendant Victor Sandstrom was found guilty of a violation of *N.J.S.A.* 39:4–50(a). The proofs were found to be insufficient to sustain a violation of *N.J.S.A.* 39:4–98 for speeding. This was the defendant's second DWI conviction. The matter was then heard *de novo* on the record in the Law Division where the trial judge found defendant guilty of DWI. The judge made it clear that without the breathalyzer results he would have been unable to find the defendant guilty of the DWI charge. The sanctions imposed pending this appeal were stayed by the Law Division judge. The sole issue raised on the appeal concerns the admissibility of the breathalyzer results when a pre-test inspection certificate as to proper working order was issued more than 30 days before the breathalyzer test was conducted and the post-test inspection certificate disclosed a malfunction in the instrument.

The facts are relatively straightforward. On March 7, 1993 at approximately 5:00 P.M. Patrolman Keenan of the Spotswood Police Department observed defendant crossing the center line and speeding. He pulled him over. Defendant had bloodshot, blurry eyes, slurred speech and a strong odor of alcohol. He indicated that he was coming from his ex-wife's house in Monroe and was going to Carteret where he lived. Defendant said he had two beers while visiting his former wife although at trial he conceded on cross examination it might have been three.

Some roadside tests were administered by the patrolman. Defendant recited the alphabet without problems, but his performance on the finger to nose test was unsatisfactory. Because the defendant suffered from a physical handicap (one leg was shorter than the other due to an accident with resulting surgery), further testing as to defendant's balance could not be conducted.

Defendant accompanied the patrolman to the station house where the breathalyzer test was administered. Two breath tests using Breathalyzer (BR900) were given. Each test registered a reading of .14% blood alcohol.

The Spotswood Police Department's daily log book was introduced at trial. That book had the following entry for March 20, 1993: "Breathalyzer not working, red light is out". An entry on the same day indicated that a defendant was transported to East Brunswick for breathalyzer testing. The log book had no notations of malfunction between the date of the prior inspection of January 28, 1993 and March 20, 1993. Patrolman Keenan, who conducted the test, was a properly certified breathalyzer operator and was able to perform the eleven step testing procedure. He found the breathalyzer to be in good working order on March 7, 1993.

The defense objected to the admissibility of the breathalyzer results on the ground that the breathalyzer was not shown to be in good working order on the day of the testing. Relying on *State v. Samarel*, 231 *N.J.Super.* 134, 555 *A.*2d 40 (App.Div.1989), the defense argued that a pre-test inspection certificate issued more than 30 days before the test was actually administered to the defendant without a post-test inspection certificate attesting to the proper working order of the breathalyzer renders the test results unreliable and, therefore, inadmissible.

The trial judge, as did Judge Deborah Venezia of the municipal court who wrote a reasoned letter opinion, rejected the argument and admitted the results of the breathalyzer test. In so doing, he concluded that a pre-test inspection certificate's validity does not depend on its being issued no more than 30 days prior to the test in question. Furthermore, the post-test inspection certificate on the breathalyzer's operability indicated that the nature of the malfunction "would make adherence to the checklist impossible." Because the breathalyzer operator was able to complete the checklist procedure, the trial judge was satisfied that the breathalyzer results were properly admissible. We agree and affirm.

In *State v. Johnson*, 42 *N.J.* 146, 199 *A.*2d 809 (1964), our Supreme Court held that a breathalyzer is sufficiently established and accepted as a scientifically reliable and accurate device for determining the alcoholic content of the blood to admit testimony of the readings obtained upon a properly conducted test. Despite repeated challenges, the Court has steadfastly held that the breathalyzer "reads alcohol with unimpeachable accuracy" and "is unsurpassed in its combined practicality and usefulness." *State v. Downie*, 117 *N.J.* 450, 468–469, 569 *A.*2d 242 (1990), *cert. denied*, 498 *U.S.* 819, 111 *S.Ct.* 63, 112 *L.Ed.*2d 38 (1990). *See also State v. Tischio*, 107 *N.J.* 504, 527 *A.*2d 388 (1987), *appeal dismissed*, 484 *U.S.* 1038, 108 *S.Ct.* 768, 98 *L.Ed.*2d 855 (1988); *Romano v. Kimmelman*, 96 *N.J.* 66, 474 *A.*2d 1 (1984); *State v. Maure*, 240 *N.J.Super.* 269, 277–279, 573 *A.*2d 186 (App.Div.1990), *aff'd o.b.*, 123 *N.J.* 457, 588 *A.*2d 383 (1991).

Oftentimes, breathalyzer test results are the sole evidence against a defendant and, as here, become dispositive of a violation of the law. Consequently, the risk of error should be reduced as much as possible. *Romano v. Kimmelman, supra*, 96 *N.J.* at 90, 474 *A.*2d 1. Noting the impact that test results have in drunk driving prosecutions, our Supreme Court has said that "proper administration of the test [must] be clearly established before the reading is admitted in evidence." *State v. Johnson, supra*, 42 *N.J.* at 171, 199 *A.*2d 809. "This includes full proof that the equipment was in proper order, the operator qualified and the test given correctly." *Ibid.* Here, we are concerned with the foundational requirement that the breathalyzer was "in proper order" when administered. *State v. Johnson, supra*, 42 *N.J.* at 171, 199 *A.*2d 809.

In challenging the proper working order of the breathalyzer, the defendant notes that the post-test inspection certificate in this case found that the "RED EMPTY light was not coming on", a malfunction which rendered the instrument inoperable because the pre-test checklist could not be completed. Defendant contends that this post-test flaw with a pre-test inspection certificate issued

40 days before the test requires the exclusion of the results. In arguing this position, defendant points to the following passage from *State v. Samarel, supra,* 231 *N.J.Super.* at 142, 555 *A.2d* 40, where we said:

> Although presenting at trial a post-test certification that a breathalyzer is in proper working order is the preferred practice, a test result may be admissible without a post-test certificate if, as here, there is a pre-test certification made within a month before the test that the machine was in proper working order and there is no evidence that the machine gave inaccurate results when used for the test.

Extrapolating from the above passage, defendant claims that the proper working order standard is not met if the pre-test inspection certificate was issued more than 30 days prior to the breathalyzer test and the post-test inspection certificate reports a malfunction. According to defendant, both ends of the inspection process have been found wanting. Simply answered, the defendant has read too much into *Samarel.*

*Samarel* does not, nor did it purport to, establish an absolute outside time limit for the validity of a pre-test inspection certificate. There is no one month limitation on the validity of a pre-test inspection certificate. Admittedly, a pre-test inspection certificate done too far in advance of the administered test may run the risk of being labelled stale on a record which could support such a finding. However, there is nothing of record here to show "inaccurate results" which undermine the validity of a pre-test inspection certificate issued 40, rather then 30, days prior to the administration of the breathalyzer test on the defendant.

Responsibility for scheduling breathalyzer inspections has been committed by the Legislature to the Attorney General, *N.J.S.A.* 39:4–50.3. In turn, the Attorney General has designated the Superintendent of the State Police as the official responsible for recording the results of inspection of breathalyzers and maintaining those records. *See N.J.A.C.* 13:51–3.4. The regulation requires that "[p]eriodic inspection of all approved instruments used in this state in connection with the prosecution of a person pursuant to the provisions of *N.J.S.A.* 39:4–50 *et seq.* (other

statutory citations omitted) shall be made by a Breath Test Coordinator/Instructor." *N.J.A.C.* 13:51–3.4. "Periodic inspection" has not been defined in the regulation and the facts as presented here do not require us to define the term.

Nonetheless, we know from *State v. Lanahan*, 110 *N.J.Super.* 578, 580, 266 *A.*2d 323 (Cty.Ct.1970), that the State Police amended its breathalyzer inspection routine as of March 1, 1970 from a monthly to a bi-monthly schedule. Bi-monthly inspections were all that was required to insure the instrument was in proper working order. Unlike the drunkometer, the breathalyzer required no chemical titration, and, therefore, a monthly inspection was viewed as unnecessary. *Ibid.* In *Lanahan*, there was a pre-test inspection certificate but no post-test inspection certificate because the effective date of the amendment had deferred the inspection to the two month cycle. The municipal court pre-trial hearing on admissibility had been concluded before the two month period expired. Nonetheless, the court ruled the breathalyzer results admissible because there was nothing shown to impugn the instrument's operation on the day the test was administered. Parenthetically, we point out that the inspections done here on January 28, 1993 and March 22, 1993 were conducted approximately bi-monthly. Our purpose in addressing the inspection schedule is to illustrate again that *Samarel* did not and was not intended to establish a 30 day pre-test inspection limitation.

As for the post-test inspection certificate, it is clear that the malfunction found could not have been in existence on the day the breathalyzer was administered to the defendant. The report of the Breath Test Coordinator Instructor who made the inspection on March 22, 1993 had this to say:

> "Complaint received of RED EMPTY light not coming on. Inspection revealed complaint founded. Inspection further revealed the Cinch–Jones plug socket not fully seated in Cinch–Jones receptacle. Plugged in socket properly restoring instrument to proper working order. *The existence of this malfunction would make adherence to the check list impossible.*"
>
> (Emphasis supplied).

Simply put, had the malfunction existed on March 7, 1993, the operator administering the breathalyzer to the defendant could

not have completed the eleven step testing procedure as he testified to doing. Thus, the nature of the malfunction does not undermine the inference of the instrument's reliability when this test was administered and, at the same time, buttresses the evidence that the instrument gave accurate test results here.

The evidence supported a determination that the breathalyzer was in proper working order on the date the test was administered to the defendant. Accordingly, the breathalyzer results were correctly admitted and appropriately relied on by the trial judge in finding defendant in violation of *N.J.S.A.* 39:4–50.

Affirmed.